MR. JUSTICE SHEEHY
specially concurring:
In addition to my opinion that the res ipsa loquitur instruction should have been given in this case, I find a new trial is required because the verdict in this case is against the evidence.
It ought to be a matter of judicial notice that a Piper PA-28 of the type involved here, if it is flown in level flight within the airspeed recommended by the manufacturer, and is kept out of clouds, will not come apart in the air. If that is not true, none of us should ever fly in airplanes.
In this case, there is no evidence from any expert that the breakup of this aircraft occurred either because of faulty maintenance and/or because of faulty structural components in its manufacture.
The witnesses on the ground near the scene of the crash testified that the day was cloudy and windy with occasional snow and sleet. They described the temperature as “cold”. They heard the noise of the motor of the aircraft overhead, *182 but could not see it because of the clouds. They heard the thud of its crash and saw the wreckage of the airplane southwest from the position where they had heard the noise of the motor.
Jeffrey Morrison of Helena, Montana, an experienced flyer in this region, testified that in his opinion, this relatively inexperienced pilot, qualified only for visual flight operations, proceeded into weather which he could have avoided, and which was beyond his limitations, lost control of the aircraft, exceeded the limitations of the aircraft, causing structural damage, which in turn caused the aircraft to come apart and crash. When asked on cross examination if he could explain his version of the sequence of the failure, he answered that he could not but that he assumed that the tail failed first because the tail pieces were the first to hit the ground.
In explanation of his opinion, Mr. Morrison testified that this was a classic case of in-flight breakup in crashes of this kind. The inexperienced pilot, enclosed in clouds, becomes disoriented within a matter of 72 seconds; inevitably the airplane turns with its nose down and there is a rapid build up of airspeed in a spiral turn, beyond the structural capability of the aircraft to withstand. The pilot responds to the situation by overreacting, pulling too strongly and too quickly on the controls hoping to restore the airplane to controlled flight. The resulting gravity forces on the plane break it apart.
Two expert witnesses testified for the defense. Both Sheldon Roberts, of San Jose, California, an engineering consultant, and James R. “Bob” Jensen of Los Altos, California, an engineering consultant, testified to the sequence.of the breakup of the airplane. In essence, they testified that the left wing flap broke away from the left wing in that the outboard bracket failed first, the middle bracket next, and the flap then failed in the airstream, pulling the third bracket out of its mooring in the inboard wing. The left wing flap then struck the left stabilator, a part of which was torn off. Thereafter, the tail section rotated upward and counterclockwise, broke off and the crash occurred.
The two California experts based their opinion of the inflight breakup upon the positions of bits of wreckage along the *183 ground up to the point where the plane ultimately came to rest against the side of the gully. The parts were strewn over some 2,075 feet.
Nowhere in the testimony, however, do the two California experts give the reason for the separation of the left wing flap. Apart from their version of the sequence of the breakup, there is nothing of substance in their testimony as to how or why the crash occurred.
The experts, however, are each strong in their opinion that the accident could not have happened in the way described by Jeffrey Morrison because of his supposed asáumption that the tail failed first. They based their opinion on the distribution of the wreckage.
The distribution of the wreckage was detailed by investigators for the Federal Aviation Administration. Along a magnetic compass heading of 325 degrees, those parts are described in the following sequence:
The first portion of wreckage is the tail cone. The left stabilator tip was found 675 feet further from the tail cone. The left flap was found 40 feet to the right of the left stabilator tip. The stabilator itself was found 275 feet beyond the left stabilator tip. The skin from the left wing root was found 120 feet outside the path of the line of flight, the vertical fin and rudder some 48 feet to the right of the flight path, and the left wing itself was found approximately 215 feet beyond the vertical fin and rudder. 800 feet from the left wing the initial ground impact occurred to the remaining portion of the plane and a short distance further is the gully in which the plane came to rest. Of course, all distances are approximate.
My review of the testimony in evidence indicates that the two experts were speaking from sheer speculation in refuting Mr. Morrison, and in refuting him, they ignored several important facets of evidence:
1. The first piece of wreckage in the line of flight of the airplane was the tail cone.
2. The left wing had tom away from its root in the aircraft. The wreckage indicated that the left wing had been bent *184 downward. This means that the left wing was inverted to the G forces exerted upon it at the time of the breakup.
3. The magnetic compass heading for this airplane, which was on its way to Bozeman from Missoula, would bp approximately 93 degrees. The line of wreckage distribution as found by the Federal Aviation Administration investigators was magnetic compass heading 325 degrees. The ground witnesses, however, indicated that the line of distribution of the wreckage was in a southwesterly direction. If the federal investigators are right, this plane was headed toward northern Idaho at the moment of breakup. If the ground witnesses are correct, the plane was headed toward California. The proper heading for this airplane if it were in level undisturbed flight would be nearly due east. The heading of the plane at breakup confirms Mr. Morrison’s opinion that the plane was in a tight spiral at the time.
4. The left wing flap at the time of initial breakup was retracted. In this position, the leading edge of the flap is protected by the left wing itself. In the retracted position, the forces on the wing flap (drag and lift) are no greater than the forces exerted on any other portions of the rear wing surfaces. The only plausible explanation for the first separation of the left wing flap is the shuddering of the aircraft caused by its speed beyond its structual capability, and downward pressure exerted on the left wing which eventually caused it to break off.
. The siim total therefore of the testimony from the defendant’s witnesses told the jury nothing about the cause of the breakup of the aircraft in flight. The sole tenor of their testimony is to dispute the opinion of Mr. Morrisdn, who stated he could not describe the exact sequence of the breakup anymore than could the expert witnesses.
I must therefore conclude that the jury was flim-flammed by the impressive degrees and background of the two wise men from California. They are professional testifiers; Mr. Jensen advised counsel for the defendant here that his investigative costs to prepare a case such as this, “probably the minimum would be near $10,000 but it could run over $50,000.”
*185 In this case, operating under visual flight rules, the pilot of this aircraft was required to stay out of clouds, one mile distant horizontally and 1,000 feet above or 1,000 feet below. Mr. Morrison’s opinion was that in the kind of weather prevailing here, the pilot could easily have avoided such clouds. That the pilot was flying in the clouds in this case is indisputable because that is where the ground witnesses heard the aircraft overhead. He was a pilot not trained for instrument flying rules. Under the circumstances, the resultant crash was nearly as predictable as the time of sunset of September 19,1978.
A verdict cannot be permitted to stand upon mere conjecture or suspicion. Fabert v. Northern Pac. Ry. Co. (1926), 77 Mont. 446, 451, 251 P. 546, 547. When the question of whether the evidence supports the verdict is before this Court, we have a duty to review the evidence to decide if the verdict is supported by substantial evidence. Bernhard v. Lincoln County (1968), 150 Mont. 557, 560-61, 437 P.2d 377, 380. A verdict must have substantial evidence to support it. Davis v. Davis (1972), 159 Mont. 355,361,497 P.2d 315,318. Here there is no substantial evidence to support the verdict of the jury because there is no evidence that this plane would break up in clear skies in level fight. Since the plane was flying in clouds at the time of its breakup, the conclusion is inescapable that the phot got into conditions for which he was untrained and unqualified and which were beyond the capability of the plane to withstand.